1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STARBOUND, LLC, a Washington limited
liability company; and, WEST COAST FISHERY
INVESTMENTS, LLC, a Washington limited
liability company,

                Plaintiffs,

     v.

CARLOS M. GUTIERREZ, in his official
capacity as UNITED STATES SECRETARY OF
COMMERCE; UNITED STATES
DEPARTMENT OF COMMERCE; NATIONAL
OCEANIC AND ATMOSPHERIC
ADMINISTRATION; and NATIONAL
MARINE FISHERIES SERVICE,

              Defendants.

CASE NO. C07-0910-JCC

ORDER

This matter comes before the Court on the parties' cross motions for summary judgment. (Dkt.

Nos. 14 &17.) Having considered the briefing and administrative record, and determining that oral

argument is unnecessary, the Court hereby finds and rules as follows.

ORDER – 1

1

2   **I.      BACKGROUND**

3          Plaintiff Starbound, LLC owns and operates the fishing vessel F/V STARBOUND. In an effort to

4   diversify and expand its operations, Plaintiff acted through its wholly owned subsidiary, West Coast

5   Fishery Investments, LLC, to acquire limited entry permits that would allow it to participate in the 2007

6   season of the Pacific Whiting Fishery ("Fishery") off the coast of Washington and Oregon. (Pls.' Mot.

7   1–2 (Dkt. No. 14).) Just prior to the onset of the fishing season on May 15, 2007, however, Defendants

8   promulgated a temporary emergency rule barring participation by any "vessel without a history of sector-

9   specific participation in the whiting fishery prior to January 1, 2007 . . ." (Admin. R. B.1 at 1.) This had

10  the effect of barring Plaintiffs from the Fishery for the 2007 season, and serves as the basis for this action.

11  To better understand the legal issues in dispute, a brief description of the underlying regulatory

12  framework is appropriate.

13         The Department of Commerce regulates the Fishery pursuant to the Magnuson-Stevens Fishery

14  Conservation and Management Act, 16 U.S.C. §§ 1801–1883 ("Act"), which has the stated purpose of

15  taking "immediate action to conserve and manage the fishery resources found off the coasts of the United

16  States . . ." 16 U.S.C. § 1801(b). Under this statutory mandate, the National Marine Fisheries Service

17  ("NMFS"), an agency of the Department of Commerce, appoints members of eight regional fishery

18  management councils that are responsible for drafting fishery management plans ("FMPs") designed to

19  "achieve and maintain, on a continuing basis, the optimum yield from each fishery." (Defs.' Mot. 3–4

20  (Dkt. No. 17); 16 U.S.C. § 1801(4).) The regional fishery councils also recommend regulations to

21  Defendant Secretary of Commerce, who reviews FMPs, recommended regulations and proposed

22  emergency rules for consistency with ten "[n]ational standards for fishery conservation and management."

23  *See* 16 U.S.C. § 1851(a).

24         The regional council at issue in this case is the Pacific Fishery Management Council ("Council"),

25  which is "authorized by the Magnuson Act to prepare FMPs for the fisheries off the coasts of

26  ORDER – 2

1

2   Washington, Oregon, and California." (Defs.' Mot. 6 (Dkt. No. 17); 16 U.S.C. § 1852(a)(1)(F).) The

3   Secretary of Commerce first approved the Council's Pacific Coast Groundfish FMP in 1982, thereby

4   attempting to regulate the fishing of over 90 species of groundfish off the Pacific coast, one of which is

5   Pacific whiting. (Admin. R. B.1 at 14.) In order to carry out the purposes of the Act, which include

6   rebuilding overfished stocks as well as maintaining ideal populations, the Council conducts an annual

7   stock assessment, which is used to determine an optimum yield, and then allocated to three different

8   fishing sectors within the Fishery: the shoreside sector, the mothership sector, and the catcher/processor

9   sector.[1] (*Id.* at 31.) The rationale for allocating portions of the optimum yield to these three sectors is to

10  reduce the incentive for a "derby-style race for fish" that might upset the desired balance of fish species.

11  *See* 72 Fed. Reg. 27759. Furthermore, preventing the disproportionate depletion of fish is not simply a

12  matter of setting quotas for species specifically targeted by fishing vessels. Because fishing nets

13  indiscriminately capture both targeted and non-targeted species of fish, the latter of which are known as

14  "bycatch," the Council also establishes bycatch limits in the Fishery for three particular overfished

15  species. 50 C.F.R. § 660.373(b)(4). If bycatch limits are reached in any one sector of the Fishery, the

16  entire fishery may be closed. (*Id.*)

17          Prior to the promulgation of the emergency rule at issue in this case, any vessel owner with a

18  groundfish limited entry permit ("LEP") registered to his or her vessel could participate in the Fishery as

19  long as it had the appropriate trawl gear and size endorsements. *See* 50 C.F.R. §§ 660.333–660.334.

20  Accordingly, Plaintiffs purchased and "aggregated" several permits, as authorized by the Regulations,

21  allowing them to operate the F/V STARBOUND in the catcher/processor sector of the Fishery. (Pls.'

22  _____

23          [1] The shoreside sector includes vessels, usually fishing in relatively shallow water close to shore,
    that deliver to land-based processors. The mothership sector refers to catcher vessels that deliver their
24  fish to "motherships," which are "essentially floating processing platforms" off-shore. Finally, the
    catcher/processor sector refers to vessels that have the capacity to both catch and then process fish
25  onboard. (Admin. R. B.1 at 31; Pls.' Mot. 3–4 (Dkt. No. 14).)

26  ORDER – 3

Mot. 6 (Dkt. No. 14).) Leading up to the time in question, the catcher/processor sector of the Fishery was distinguished by a highly organized system of communication and cooperation among its participants, all of whom were members of a private, voluntary business arrangement known as the Pacific Whiting Conservation Cooperative ("PWCC"). (Admin. R. B.1 at 4–5.) By coordinating their efforts and voluntarily agreeing on how to divide the catcher/processor allocation, the PWCC has been able to achieve a level of stability in that sector that both parties readily acknowledge.

In response to what it perceived were changed circumstances threatening stability in the Fishery leading into the 2007 season, the Council recommended that the NMFS implement an emergency rule that would severely limit the participation of American Fisheries Act-qualified vessels in the Fishery.[2] (Admin. R. B.1 at 2.) Several parties opposed this proposed rule, including the State of Washington Department of Fish and Wildlife, and on January 11, 2007, the NMFS declined to adopt the recommendation. (*Id*. at 3; Pls.' Mot. 9 (Dkt. No. 14).) In its March 2007 meeting, however, the Council reconsidered the issue of an emergency rule based on the belief that certain recent developments could lead to a "race for fish" in the Fishery during the 2007 season. (Admin. R. B.1 at 3.) Consequently, it recommended an emergency rule that would "prohibit[] participation in either the shorebased, catcher/processor, and mothership sectors of the fishery by any vessel that has no sector-specific history of participation prior to January 1, 2007." (*Id*.) This time, representatives from all three affected states, including the State of Washington official who opposed the prior iteration of the rule, supported the emergency rule. (Admin. R. J-3, 95:10–98:19, 91:16–94:3, 101:15–103:11.) The NMFS approved the rule and submitted it for publication in the Federal Register on May 11, 2007. *See* 72 Fed. Reg. 27764. Defendants viewed this action as a stopgap measure to maintain stability in the Fishery until they could finalize an amendment to the FMP for the long-term. (*Id*. at 27761.) Finally, in order to mitigate the

---

[2] The F/V STARBOUND is authorized under the American Fisheries Act to participate in the Bering Sea and Aleutian Island pollock fishery as a catcher/processor. (Defs.' Mot. 8 n.3 (Dkt. No. 17).)

ORDER – 4

economic impact of the rule on those, like Plaintiffs, who had invested in permits only to be prohibited from participation in the 2007 season, the rule allowed for the "disaggregation" and transfer of such permits, a practice not previously allowed under the regulations. (*Id.*)

On June 12, 2007, Plaintiffs filed this suit claiming that the rule is "arbitrary and capricious," and that use of the emergency rule procedure was inappropriate under the circumstances. In its prayer for relief, Plaintiffs ask that the Court declare the rule invalid, and declare:

> [B]ut for Defendants' wrongful adoption of the Rule, Plaintiffs would have participated in the 2007 Fishery and that, for the purposes of any future related FMP amendment or rationalization plan, Plaintiffs' [*sic*] are entitled to the benefit of the fishing history they would have accrued, had they been allowed to participate in the 2007 Pacific whiting fishery

(Compl. (Dkt. No. 1 at 22).)

## II.     DISCUSSION

### A.     Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). There is no genuine issue for trial unless there is sufficient evidence to support a jury verdict in favor of the nonmoving party. *Anderson*, 477 U.S. at 250. The moving party has the burden of demonstrating the absence of a genuine issue of material fact. (*Id.* at 257.) Furthermore, the Court must draw all reasonable inferences in favor of the nonmoving party. *See F.D.I.C. v. O'Melveny & Myers*, 969 F.2d 744, 747 (9th Cir. 1992), *rev'd on other grounds*, 512 U.S. 79 (1994).

In addition to demonstrating that there are no questions of material fact, the moving party must also show that it is entitled to judgment as a matter of law. *Smith v. Univ. of Washington Law School*, 233 F.3d 1188, 1193 (9th Cir. 2000). The moving party is entitled to judgment as a matter of law when

ORDER – 5

1

2   the nonmoving party fails to make a sufficient showing on an essential element of a claim for which the

3   nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

4         The Magnuson-Stevens Fishery Conservation and Management Act provides that "[r]egulations

5   promulgated by the Secretary . . . shall be subject to judicial review," and if the petition is filed within the

6   applicable 30 day window, "the appropriate court shall only set aside any such regulation or action on a

7   ground specified in section 706(2)(A), (B), (C), or (D) of such Title." 16 U.S.C. § 1855(f)(1). Turning to

8   the relevant provision of the Administrative Procedures Act, a court may "hold unlawful and set aside

9   agency action, findings, and conclusions found to be– (A) arbitrary, capricious, an abuse of discretion, or

10   otherwise not in accordance with law . . ." 5 U.S.C. § 706(2)(A). Under this test, a court must simply

11   determine "whether the Secretary 'has considered the relevant factors and articulated a rational

12   connection between the facts found and the choice made.'" *Alliance Against IFQs v. Brown*, 84 F.3d

13   343, 345 (9th Cir. 1996) (quoting *Washington Crab Producers, Inc. v. Mosbacher*, 924 F.2d 1438,

14   1440–41 (9th Cir. 1990)). Thus, a court "cannot substitute [its] judgment of what might be a better

15   regulatory scheme, or overturn a regulation because [it] disagree[s] with it, if the Secretary's reasons for

16   adopting it were not arbitrary and capricious." *Alliance Against IFQs*, 84 F.3d at 345.

17       **B.**    **Over-length Briefing**

18         Defendants' Reply brief (Dkt. No. 24) for its Cross Motion for Summary Judgment substantially

19   exceeds the twelve page limit set forth in the local rules. *See* Local CR 7(e)(3). Plaintiffs move to strike

20   the Reply, or in the alternative, the portion of the brief exceeding the permissible limit. (Pls.' Mot. 1–2

21   (Dkt. No. 25).) In response, Defendants have filed a Motion for Leave to File Over-Length Brief Out of

22   Time, arguing that good cause exists for its deviation from the Rule, and observing that Plaintiffs have

23   not followed the proper procedure for a motion to strike, as set forth in Local Civil Rule 7(g). (Defs.'

24   Mot. 1–2 (Dkt. No. 27).)

25         Both parties have indeed failed to comply with the local rules, and therefore Plaintiffs' Motion

26   ORDER – 6

1

2   (Dkt. No. 25) is STRICKEN, and Defendants' Motion (Dkt. No. 27) is DENIED. The Court will

3   disregard Defendants' Reply brief beyond page 12.

4       **C.**    **Mootness**

5           Defendants' threshold argument is that Plaintiffs' challenge to the emergency rule is moot. (Defs.'

6   Mot. 12–16 (Dkt. No. 17).) Defendants observe that the 2007 fishing season has closed and therefore the

7   rule, whose effect by law could only extend to the 2007 season, no longer visits any detriment upon

8   Plaintiffs. With regard to Plaintiffs' prayer for a declaratory judgment that it was legally entitled to

9   participate in the 2007 whiting fishery, Defendants argue that "such retroactive relief is not available

10  under the APA and the Magnuson Act," which only permits remand to the NMFS, and which "would

11  serve no purpose because the 2007 season is over." (*Id*. at 13–14.) Plaintiffs respond that while the

12  fishing season has ended, the emergency rule is still technically in effect. (Pls.' Reply 3 (Dkt. No. 19).)

13  Furthermore, Plaintiffs contend that because of a disaster tow in the shoreside sector, the season ended

14  especially early on July 26, 2007, leaving insufficient time for a reasonable challenge while the rule still

15  had effect. (*Id*. at 4–6.) Finally, Plaintiffs maintain that any future rationalization plan, if past practice is

16  any indication, will likely contain qualifying criteria based upon prior participation, and therefore their

17  legal entitlement to fish during the 2007 season is of great consequence. (*Id*. at 6–8.)

18          Defendants are quite right that no decision by this Court as to the validity of the emergency rule

19  can allow Plaintiffs to fish in a season that has long since closed. However, for reasons to be discussed

20  further, this case is not really about the missed opportunity of the 2007 season. The parties agree that

21  prior to the promulgation of the rule on the eve of the 2007 season, Plaintiffs had taken all the necessary

22  steps to participate in the catcher/processor sector of the Fishery. Plaintiffs' theory is that but for an

23  invalid rule, they would have an established history of participation in the Fishery which has ramifications

24  for their participation under future iterations of the FMP. Certainly the content of the emergency rule

25  itself suggests that the interests of established players in the Fishery take priority as the regulatory climate

26  ORDER – 7

evolves. This is not to say that had Plaintiffs been allowed to participate in the 2007 season, they would necessarily have procured an entitlement in the Fishery. However, it is a far different proposition for Defendants to say that Plaintiffs, having taken affirmative steps to avail themselves of the opportunities under a particular regulatory regime, could have no way to return to the status quo ex ante, even if changes to that regime were patently unlawful. Suffice it to say, the Court is not convinced that if the emergency rule here was set aside as invalid, Plaintiffs would have nothing to gain. Accordingly, the Court deems this a live, justiciable controversy.

**D.      Motion to Strike**

Plaintiffs move to strike the declaration of Frank Lockhart, offered by Defendants in support of their cross motion for summary judgment, because the Court's review is to be confined to the administrative record. (Pls.' Reply 2 (Dkt. No. 19).) Defendants respond that they offered Mr. Lockhart's declaration only "to demonstrate that *subsequent events* occurring *after* the Emergency Rule was issued have rendered Starbound's claims moot." (Defs.' Reply 3 (Dkt. No. 24) (emphasis in original).) With the Court having found that Plaintiffs' claims are not moot, the only purpose for which Defendants offer the declaration has been decided against them, and therefore Plaintiffs' request is itself moot.

**E.      Substantive Merits of the Emergency Rule**

Plaintiffs assert that the emergency rule was "arbitrary and capricious," and therefore may be held unlawful and set aside by this Court under 5 U.S.C. § 706(2)(A). (Pls.' Mot. 15 (Dkt. No. 14).) Relying primarily on what it deems to be significant differences between the catcher/processor sector and the shoreside sector, Plaintiffs argue that the threat of an "accelerated race for fish," if it did exist, was not posed by the catcher/processor sector. That is, because excessive bycatch levels are "almost exclusively confined to the Shoreside sector," barring participation by new catcher/processor vessels is an irrational way to achieve the conservation goals of the Fishery. (*Id.* at 16.) Plaintiffs also cite the cooperative venture of the PWCC as evidence that there was no reason to exclude catcher/processor vessels from

ORDER – 8

1

2   what has traditionally been a stable sector of the Fishery. (*Id*. at 18–19.)

3         These arguments ignore the content of the emergency rule, Fishery regulations, and the practical

4   realities involving participants. First, the rule does not single out catcher/processor vessels specifically,

5   but rather "any vessel that has no sector-specific history of participation prior to January 1, 2007."

6   (Admin. R. B.1 at 1.) The purpose of this broad administrative action was to prevent new entry at a time

7   when a confluence of market and regulatory factors provided added incentives to participate in the

8   Fishery. (*Id*. at 4–5.) Even assuming that bycatch rates are much higher in the shoreside sector than in the

9   catcher/processor sector, Plaintiffs acknowledge that catcher/processor vessels contribute to the problem

10  to some degree. (Pls.' Mot. 18 (Dkt. No. 14).) Because the regulations provide for shutting down the

11  entire fishery upon reaching bycatch limits in any one sector, it surely was not *irrational* to restrict new

12  entry by both greater and lesser "offenders" for a temporary period of time. To say that Defendants could

13  have fashioned a rule with a more limited scope, perhaps targeted solely at the shoreside sector, suggests

14  only a more narrowly tailored version that Plaintiffs deem superior. The merits of this claim

15  notwithstanding, Defendants' reasoning was not arbitrary or capricious, and it is not the Court's role to

16  substitute its judgment for the Agency's in search of a better rule.[3]

17        And yet, there is a more fundamental problem with Plaintiffs' argument that has little to do with

18  the catcher/processor sector's bycatch numbers in the past, or even the sheer number of vessels and

19  harvesting capacity expected in the Fishery for 2007. While these factors surely have some relationship to

20  the bycatch problem, the *manner* in which participants fish over the course of a season also determines

21

22      [3] In their response to Defendants' Cross Motion for Summary Judgment, Plaintiffs argue for the

23  first time that the Government failed to respond to certain "alternative management tools" proposed
    during the notice and comment process. (Pls.' Resp. 9–10 (Dkt. No. 22).) Putting aside that this should

24  have been raised in Plaintiffs' original motion, it falls short of demonstrating that Defendants failed to
    adequately respond to public comment. Rather, it shows that Plaintiffs felt they could fashion a better

25  rule, which is not Defendants' obligation to disprove.

26  ORDER – 9

the likelihood that they will reach bycatch limits prematurely. That is, because bycatch rates are higher in the early months of the season, intensive fishing at those times presents a heightened risk of a "disaster tow" and early closure of the Fishery. (*See* Admin. R. B.1 at 4.) Plaintiffs dismiss this concern with regard to the catcher/processor sector by relying heavily on the notion that it is "operationally unique" due to the cooperative management structure of the PWCC, and "[h]ad Starbound been permitted to participate in the Whiting Fishery, it would have joined the Cooperative and abided by all of its rules and requirements." (Pls.' Mot. 19 (Dkt. No. 14).) Thus, Plaintiffs maintain that it was "arbitrary and capricious" to promulgate a rule prohibiting new entrants into that particular sector. This argument borders on disingenuous, because as the record and Defendants' briefing reveal, there was staunch opposition by members of the PWCC to new participants in the catcher/processor sector, to the point that the PWCC indicated it would "terminate" upon entry of new catcher/processors into the Fishery. (Admin. R. M.18.) In response, and sounding much less like an eager, would-be member, Plaintiffs characterize this as "extort[ion]" and "blackmail," and proof that "[t]his is an allocation issue, not a conservation, safety, or economic disaster issue." (Pls.' Reply 10 (Dkt. No. 19).)

Rather than the dichotomy that Plaintiffs' construct, this appears to be *both* an allocation issue and a conservation issue, with Defendants' primary concern being the latter. The parties agree that cooperation and communication in the catcher/processor sector by members of the PWCC has contributed greatly to the stability of the Fishery. This system, however, is a voluntary one, the absence of which produces the paradigmatic "tragedy of the commons," in which individual fishing interests have an incentive to aggressively fish early in the season, when bycatch levels are high, in order to ensure their own yield. If all participants behave this way, as they are pressured to once the cooperative structure breaks down, they reach bycatch limits early and the whole Fishery closes prematurely. This was clearly a main concern upon which the Council relied in making its recommendation, (Admin. R. B.1 at 4–5), and whatever motives Plaintiffs would ascribe to the PWCC, it is fundamentally about conservation from

ORDER – 10

1

2    Defendants' standpoint. While the PWCC's position was surely informed by its members' own

3    commercial interests, it is not the Cooperative's rationale that is subject to review. Even if Defendants

4    were influenced by the allocation concerns of established participants, this fact alone does not invalidate

5    the rule as long as the record supports a primary concern for conservation and Defendants articulate a

6    rational connection between means and ends. In sum, it was not arbitrary or capricious for Defendants to

7    consider how the potential breakdown of an entirely voluntary arrangement could have had deleterious

8    consequences for fishing patterns in the Fishery.[4] And again, this is a concern wholly distinct from how

9    the catcher/processor sector performed in the past, or the sheer number of vessels and harvesting capacity

10   expected in the Fishery for 2007.

11   **F.      Use of the Emergency Rule Mechanism**

12          Plaintiffs contend that aside from the substance of the rule itself, use of the emergency rule

13   mechanism in these circumstances was improper. (Pls.' Mot. 20–23 (Dkt. No. 14).) The NMFS policy

14   guidelines describe the criteria governing use of emergency rules as follows:

15          For the purpose of section 305(c) of the Magnuson-Stevens Act, the phrase "an
            emergency exists involving any fishery" is defined as a situation that:
16
            (1) Results from recent, unforeseen events or recently discovered circumstances; and
17          (2) Presents serious conservation or management problems in the fishery; and
            (3) Can be addressed through emergency regulations for which the immediate benefits
18          outweigh the value of advance notice, public comment, and deliberative consideration of
            the impacts on participants to the same extent as would be expected under the normal
19          rulemaking process

20   62 Fed. Reg. 44422. Plaintiffs argue that entry by new participants in 2007 was not an "unforeseen

21   event[]" that would justify an emergency rule, since the number of participants in the Fishery had

22   fluctuated over the previous ten years. (*See* Admin. R. B.1 at 44.) For example, the catcher/processor

23   sector, Plaintiffs observe, experienced a 50% increase in vessels from 2005 to 2006. (*Id.*) Plaintiffs also

24   _____

25          [4] Plaintiffs argue that the PWCC would not have actually dissolved upon new entry into the
     catcher/processor sector. (Pls.' Reply 10–11 (Dkt. No. 19).) This is not Plaintiffs' bluff to call.

26   ORDER – 11

1

2   argue that any threat was speculative rather than "very likely," that even if it existed it was confined to

3   sectors other than the catcher/processor sector, and that Plaintiffs' entry constituted no increase in

4   harvesting capacity because it aggregated pre-existing permits. (Pls.' Mot. 21–23 (Dkt. No. 14).) These

5   arguments fail to demonstrate that use of the emergency rule mechanism was unlawful.

6          First, the possibility of new entry, in and of itself, is not the "unforeseen event[]" that justified the

7   rule. This strawman only diverts attention from the specific factors that Defendants relied upon to

8   conclude that a spike in new entry was likely, and that it would undermine established fishing patterns

9   that had contributed to the stability of the Fishery. In support of the emergency rule that was adopted, the

10  Council cited four facts that "exacerbated their concern about an increased race for fish." (Admin. R. B.1

11  at 3.) First, the price of whiting continued to increase to unprecedented levels, making it a more appealing

12  option for fishing operations. Second, this price increase was accompanied by a 10% reduction in the

13  optimum yield from 2006 to 2007, making an increasingly valuable commodity even more so by reducing

14  supply. Third, because of unexpectedly high bycatch rates for rockfish, the Council had already placed

15  more severe restraints on non-whiting groundfish fishing, thereby making the whiting fishery more

16  attractive. Finally, the Council cited the reduction in the 2007 optimum yield for Alaska pollock, which

17  provided an incentive for AFA-qualified vessels (such as the F/V STARBOUND) to shift their operations

18  to the Fishery. (*Id.*) While it may have been nothing new to say that the number of vessels in the Fishery

19  would fluctuate from year to year, it was entirely rational to think that these factors would contribute to a

20  spike in participation for 2007. Indeed, Plaintiffs' observation as to the 50% increase in the number of

21  vessels from 2005 to 2006 only buttresses Defendants' claim that an upward trend was developing. (*See*

22  *id.* at 44.)

23          This being the case, Plaintiffs also maintain that increased participation does not necessarily lead

24  to higher bycatch rates. (Pls.' Resp. 5 (Dkt. No. 22).) Even if this is true, and frankly all things being

25  equal it is hard to believe that participation and bycatch are not somehow linked, it still does not address

26  ORDER – 12

Defendants' concerns about a breakdown in established fishing patterns as a result of new entry. For the reasons set forth above in the discussion about the PWCC's cooperative structure, Defendants articulated a rational connection between new entry and an increased race for fish that could have presented an imminent and serious conservation problem for the Fishery. (Admin. R. B.1 at 74–75.) This was a legitimate basis for the emergency rule.

Plaintiffs' argument about the degree of certainty Defendants must have in order to promulgate an emergency rule is also without merit. Nothing in the regulations or guidelines supports the notion that Defendants must be assured that an emergency *would* arise before they can utilize the option of an emergency rule. National Standard (2) states that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2). Relying on scientific data about relative bycatch rates throughout a season, as well as the four market-based factors set forth above, and the possibility that new entry would undermine cooperation and coordination by participants in the Fishery, Defendants made an informed decision, based on the best available information, that there was a serious threat to conservation interests justifying a temporary emergency rule. Indeed, while a standard requiring utter certainty of harm might serve Plaintiffs' individual interest, it is not the luxury of an agency with a compelling public policy mandate to simply wait until harm conclusively manifests itself. This is all the more true in an area involving scarce natural resources, the depletion of which can be difficult, if not impossible, to reverse.

Finally, Plaintiffs argue that the rule's attempt to mitigate its effect on excluded participants by permitting "disaggregation" of permits is "nonsensical and contradicts the premise" of the rule itself. (Pls.' Resp. 10 (Dkt. No. 22).) Because "the likely result of such dissaggregation is that the permits will go back on the original boats and they will be redeployed into the Fishery," Plaintiffs reason, the mitigating measure will only increase harvesting capacity. (*Id.*) The record demonstrates that this is a fallacious assumption. Testimony before the Council indicated that some of Plaintiffs' permits were

ORDER – 13

1

2   acquired from vessels that had been inactive in the Fishery for a number of years. (Admin. R. J-3,

3   63:14–65:21.) Whatever caused this drop in participation, Plaintiffs' assumption that the original boats

4   would simply redeploy into the Fishery with increased harvesting capacity is not supported by the record.

5   Indeed, the underlying logic of maintaining stability by barring vessels without a sector-specific history in

6   the Fishery was that established players have established patterns that are likely to continue.

7   **III.    CONCLUSION**

8          Plaintiffs' frustration at having taken all the appropriate steps to participate in the Fishery only to

9   be excluded at the eleventh hour is understandable. However, one of the risks attendant to their enterprise

10  in a highly regulated arena is that countervailing considerations of public policy will take precedence over

11  individual commercial interests. This is just such a case. Furthermore, this is not a situation in which

12  Plaintiffs' are asked to simply forsake an investment made in reliance upon a more favorable regulatory

13  climate. Indeed, Plaintiffs evince little concern for the lost opportunity of the 2007 season because the

14  rule allows them to recoup the cost of their permits and thereby return to their pre-investment status.

15  Plaintiffs' main concern appears to be establishing a foothold in the Fishery so that they cannot be

16  excluded from participation by future amendments to the FMP that might delineate rights according to

17  prior participation. Since the Court has found that the emergency rule was a proper exercise of

18  Defendants' regulatory authority, Plaintiffs will have to vindicate their commercial aspirations through the

19  ordinary administrative process going forward.

20         For the foregoing reasons, Defendants' Cross Motion for Summary Judgment (Dkt. No. 17) is

21  hereby GRANTED, and Plaintiffs' Motion for Summary Judgment (Dkt. No. 14) is DENIED.

22  Furthermore, Plaintiffs' Motion to Strike (Dkt. No. 25) is STRICKEN and Defendants' Motion for Leave

23  to File Excess Pages Out of Time (Dkt. No. 27) is DENIED.

24  //

25  //

26  ORDER – 14

1

2

3        SO ORDERED this 15th day of April, 2008.

4

5

6

7        John C. Coughenour
         United States District Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26      ORDER – 15